UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | No. 2:08-CR-109 |
| | ) | |
| JIMMY FOX | ) | |

## **REPORT AND RECOMMENDATION**

Defendant is indicted for possessing two firearms and ammunition while he was an unlawful user and an addict of a controlled substance. He has filed two motions to suppress evidence. First, he has filed a motion to suppress all statements made by him to law enforcement agents during a search of his residence on July 7, 2008. (Doc. 21). Second, he has filed a motion to suppress all physical evidence seized as a result of that search, as well as any statements to law enforcement agents made by him and his live-in companion, Kelly Leonard, during or after the search. (Doc. 24).

These motions have been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on March 6, 2009.

On July 7, 2008, defendant was an elected constable for Washington County, Tennessee. Defendant began his law enforcement career in 1995, serving in different capacities with various law enforcement agencies. After the search of his and Leonard's

residence on July 7, 2008, and the resulting publicity, defendant did not seek reelection to the position of constable. He subsequently obtained employment with the Unicoi County Sheriffs Department as a jailer, but he was fired from that position after he pleaded guilty to a charge of stealing money from the inmates.

Defendant resided with Kelly Leonard in Johnson City, Tennessee. Although defendant and Ms. Leonard were not married, they had resided together for a number of years, and they had a child.

Some time prior to July 2008, Special Agent Michael Templeton of the Drug Enforcement Administration commenced an investigation into a large scale marijuana trafficking organization in Washington County. Ms. Leonard was one of the suspects in that investigation.

On July 3, 2008, Agent Templeton requested the magistrate judge of this court to issue a search warrant for the residence of Ms. Leonard at 801 Mullins Street in Johnson City, Tennessee. He also applied for warrants to search eleven additional locations, each of which was involved in the on-going investigation of marijuana trafficking.[1] Agent Templeton submitted one affidavit in support of all twelve search warrants.[2]

The warrant for Leonard's and defendant's residence was executed on July 7, 2008, at 3:30 p.m. by Agent Templeton, who was assisted by Agent Vince Walters and various

---

[1] All of the individuals whose residences or businesses were searched were charged in Case No. 2-08-CR-102; it has grown to include in excess of thirty defendants.

[2] *See*, Doc. 18-6.

members of the Washington County Sheriffs Department SWAT team. Ms. Leonard was at home when the warrant was executed. Defendant was not at home; he ostensibly was fulfilling his duties as an elected law enforcement officer for Washington County at that time.

As relevant to the charges against defendant herein, the executing officers found "user" amounts of marijuana; digital scales used for weighing marijuana; memorabilia of defendant's law enforcement career; a photograph of defendant, in uniform, smoking a "bong"[3]; a two-shot derringer, which Ms. Leonard told the officer belonged to defendant; and a "duty belt" and an empty holster customarily worn by a law enforcement officer.

After being advised of her *Miranda*-rights, Ms. Leonard denied to Agent Templeton that she was involved in any drug-trafficking activities, although she stated that defendant was a user of marijuana.[4]

Ms. Leonard told Agent Templeton that defendant got off work at approximately 5:00 p.m. and she asked if she could call him. Agent Templeton gave her permission to do so, telling her that they would wait until defendant arrived. Defendant arrived at approximately 5:30, parking his vehicle in the yard, parallel to the driveway.

Agent Templeton had no intention to arrest defendant, although he admittedly wanted to question him.

Prior to defendant's arrival, Agent Templeton told several of the officers to go home.

---

[3] A bong is a device used to smoke marijuana.

[4] Later, with the urging of defendant, Ms. Leonard acknowledged her involvement in the marijuana trade.

3

He instructed the remaining officers not to approach defendant when he arrived, except for Lieutenant William Gregg of the Washington County Sheriffs Department, who had been friends with defendant since they were both children, and who had worked with defendant at various times in their capacities as law enforcement officers.

Defendant, of course, was fully aware that a search warrant was being executed at his residence. When he arrived, Gregg walked up to him, and the two men shook hands. Gregg then introduced defendant to Agent Templeton, and they also shook hands. Defendant then led both men back into the house. The meeting and subsequent conversations commenced cordially, and they remained so throughout. Agent Templeton told defendant why they were there, *viz.*, to execute a search warrant as part of their investigation of Ms. Leonard's marijuana trafficking. Agent Templeton also told defendant that based upon the results of the search and Leonard's statements, he believed that defendant was using marijuana.

Defendant acknowledged that he had smoked marijuana for a year, that he had no excuses for doing so as a law enforcement officer, and that he was "ashamed." He denied having any knowledge that Ms. Leonard was engaged in drug trafficking.

Defendant was then shown the photograph of himself smoking the bong. Based upon defendant's apparent weight in that photograph, Lieutenant Gregg knew that the photograph was at least several years old, meaning that defendant was untruthful when he said that he had used marijuana for only a year. Confronted as he was with the incontrovertible evidence of his lie, defendant admitted that he had been a "social user" of marijuana for longer than a year.

4

Agent Templeton instructed an officer to search defendant's vehicle, in which was found a Glock handgun carried by defendant in the course of his law enforcement duties, as well as ammunition.

Agent Templeton testified that he did not provide any *Miranda* warnings because he never intended to arrest defendant, and because defendant was never in custody at any time.

### *THE SEARCH WARRANT (DOC. 24)*.

Defendant argues that the search warrant authorized by the magistrate judge of this court was not supported by probable cause to believe that evidence of a crime would be found at Ms. Leonard's residence. Defendant asks that all physical evidence seized as a result of the search of the residence be suppressed, as well as any evidence seized from the search of his vehicle. He also asks that all incriminating statements made by him and Ms. Leonard be suppressed as "fruit of the poisonous tree."

On July 3, 2008, Agent Mike Templeton of the Drug Enforcement Agency applied for and obtained several search warrants in connection with an investigation of a marijuana distribution conspiracy. Each of the warrants was supported by a single forty- page affidavit common to them all. Among the residences for which a search warrant was sought was "the residence of Kelly Leonard located in Washington County, Tennessee, at 801 Mullins Street, Johnson City, Tennessee," which of course is the residence of Ms. Leonard and the defendant herein.

The following is a very brief synopsis of the affidavit:

The apparent leader of the drug distribution network was Jose Colunga, for whom

5

Kelly Leonard and various others allegedly distributed marijuana and collected payment. In the affidavit, Agent Templeton stated that, "[t]hrough my training and experience, I know that it is common for drug traffickers to secret proceeds of drug sales and records of drug transactions in secure locations within their residences..." P. 4, ¶ 2(a). He then states that drug traffickers commonly keep these records "for months or years after the event..." He described the tools of the trade utilized by drug traffickers and other items, such as currency, that are usually found in their residences. P. 4, ¶ 2(b). Agent Templeton then described his interaction with a confidential source ("CSI") whom he utilized in his investigation of the conspiracy. He stated that the CSI was "later proven reliable" by virtue of providing information which he independently verified on a continuing basis during the investigation. The CSI had "witnessed Jose Colunga obtain and re-distribute thousands of pounds of marijuana in East Tennessee." P. 14, ¶ 24. This CSI worked extensively for the agents on May 12, 14, and 17, 2008, the later date having special significance with respect to Ms. Leonard and the defendant herein.

The CSI told the officers that numerous individuals named in the affidavit "assisted" Jose Colunga in distributing marijuana. Among those identified by the CSI was Kelly Leonard. P. 15, ¶ 25. On May 17, 2008, Agent Templeton and others conducted surveillance on Jose Colunga. The CSI, whom Agent Templeton testified was wearing a transmitting device, accompanied Colunga when he went to the residence of Kelly Leonard and met with Leonard and Jimmy Fox. For thirty minutes, Agent Templeton observed Colunga and the CSI talk with Leonard and "Jimmy Fox, a former (Washington County Sheriffs Department)

6

Detention Officer, and a current Washington County Constable and Reserve Deputy for Unicoi County Sheriff's Office." He stated that the meeting took place around a yellow Kawasaki 1100 motorcycle parked in the carport of the residence. A check of the licence number revealed the vehicle was registered to Defendant. For some reason, the transmitting device failed to operate properly so Agent Templeton was unable to hear the conversation. However, the CSI later told Agent Templeton that "Colunga planned on trading Leonard 3 lbs. of marijuana in exchange for the motorcycle." Also, the CSI reported that both Leonard and defendant were "high" from smoking marijuana.

On May 29, 2008, the CSI met with Jose Colunga while wearing a transmitting device which on that occasion, functioned properly. In their conversation, Colunga told the CSI that individuals who owed Colunga money for marijuana, or to whom Colunga owed money, needed to be assigned code names. He then named various individuals and assigned them code names. In the conversation, he stated that, "Kelly Leonard, code name Beneficial, was paid in full..." P. 25, ¶ 37.

Based upon the affidavit, the search warrant for the residence of Kelly Leonard was issued on July 3, 2008, authorizing the search of "[t]he residence of Kelly Leonard, located at 801 Mullins Street, Johnson City, Tennessee, 37604, and any and all outbuildings, appurtenances, storage areas, vehicles, and trailers found within the curtilage thereof..." for paraphernalia of drug trafficking, records, money, weapons and other items.

Defendant argues that the affidavit may have established probable cause to secure an arrest warrant for Ms. Leonard, but it certainly did not establish probable cause to believe

7

that evidence of criminal activity would be found at her residence on July 7, 2008. When the application and affidavit were first presented on July 3, 2008, this magistrate judge believed that probable cause was established to search the residence of Ms. Leonard for evidence of marijuana drug trafficking, and that belief persists.

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is not to be judged by a "more likely than not" inquiry. *Green v. Reeves*, 80 F.3d 1101, 1105, (6th Cir. 1996); rather, probable cause exists "if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *United States v. Beasase*, 521 F.2d 1306, 1307 (6th Cir. 1975).

Defendant extracts from the affidavit five discrete paragraphs and argues that those isolated paragraphs do not establish probable cause to search Kelly Leonard's residence, stating that "the factual allegations [that connect] Ms. Leonard to this conspiracy are sparse in comparison [to] that of others."[5] What defendant chooses to ignore, however, is the fact that the affidavit provided much detail regarding the extensive marijuana trafficking of Jose Colunga. The information concerning Mr. Colunga, coupled with Mr. Colunga's effort to swap three pounds of marijuana for Ms. Leonard's motorcycle, and his assignment to Ms. Leonard of a code name for marijuana purchases, would suggest to any reasonable person

---

[5]Brief, Doc. 24, p. 6.

that Ms. Leonard was consistently involved with Mr. Colunga in the marijuana trade.

An affidavit may not be parsed down to isolated snippets, each of which is analyzed independently of all the others in a "divide and conquer" attack. *See, United States v. Arvizu*, 535 U.S. 266 (2002). Probable cause is determined from the totality of the circumstances, *Illinois v. Gates, supra*, and the totality of the circumstances described in Agent Templeton's affidavit indicated that evidence of marijuana trafficking probably would be found in Ms. Leonard's residence. Not only does Agent Templeton's affidavit recite that his experience teaches that drug traffickers often keep drug ledgers and drug sale proceeds in their homes, that is also a part of the jurisprudence of the Sixth Circuit: *See, United States v. Jones,* 159 F.3d 969, 974 (6th Cir. 1998): "In the case of drug dealers, evidence is likely to be found where the drug dealers live." *See also, United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991) and *United States v. Goward*, 2006 WL 1952282 (6th Cir. 2006). There was probable cause to issue a warrant to search the premises of Ms. Leonard.

Defendant also complains that his vehicle was searched. It is noted that the search warrant authorized Agent Templeton to search not only the residence at 801 Mullins Street in Johnson City, but also "all outbuildings, appurtenances, storage areas, vehicles, and trailers found within the curtilage thereon . . . ." A search warrant for "all vehicles" on the premises to be searched extends to the vehicles of third parties who arrive during the execution of the warrant. *See, United States v. Thompson*, 1996 WL 428418 (6th Cir. 1996), and cases cited therein.

Lastly, defendant's and Ms. Leonard's statements should not be suppressed as a "fruit

9

of the poisonous tree," since there was probable cause to issue the search warrant.

*MOTION TO SUPPRESS STATEMENTS*.  *(DOC. 21)*

Defendant seeks to suppress all statements made by him to Agent Templeton on July 7, 2008, on two bases: first, he claims that he was in custody, as a result of which he should have been given his *Miranda* warnings; second, he argues that there was no probable cause for the search of his residence and, since his conversation with Agent Templeton was the direct result of that search, it was a "fruit of the poisonous tree," requiring suppression.

*FRUIT OF THE POISONOUS TREE*

To be sure, defendant would not have been questioned by Agent Templeton but for the execution of the search warrant.  However, as discussed in the section preceding, there was probable cause to search the residence of defendant and Ms. Leonard for evidence of Ms. Leonard's drug trafficking activities.  The tree, therefore, was not "poisonous".

*LACK OF MIRANDA WARNINGS*

When a person is interrogated by a law enforcement officer, *Miranda* warnings are required when that person is either in custody, or the functional equivalent of custody. *Miranda v. Arizona*, 384 U.S. 436 (1966).  The test for determining whether a person is "in custody" under *Miranda* is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

As already noted, Agent Templeton did not intend to arrest defendant and in fact he

did not.  Although Agent Templeton acknowledged that he never told defendant that he was free to leave, he did nothing to objectively suggest that defendant's freedom of movement was in any way restricted.

Defendant testified that he *believed* that he was not free to leave.  Although acknowledging that everyone was polite and cordial, he points out that Agent Templeton asked another officer to pat him down, and from that point onward he never felt free to leave.

A mere pat-down search will not create a custodial situation. *See, e.g., United States v. Wright*, 2007 WL 1028863 (6th Cir. 2007).  Moreover, a suspect's freedom of movement can be curtailed, even to the point of being placed in the back set of a police cruiser, and he still may not be "in custody" for *Miranda* purposes.  *Id*.  More importantly, defendant's testimony that he believed that he was in custody was outrageous and he was not believed. At the time of this search, defendant had been a law enforcement officer for thirteen years, and by his own admission had been to over one hundred training sessions for law enforcement officers.  He also admitted that he knew the purpose of a pat-down search. The test for determining whether an interrogation was custodial is an objective one, not subjective.  It is not what a guilty person at the time of questioning believes, but rather what a reasonable person "innocent of any crime" would believe in the defendant's position. *United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003).  To be sure, a suspect's prior experience with law enforcement is not a relevant factor in an objective analysis of whether he was in custody for *Miranda* purposes, *Yarborough v. Alvarado*, 541 U.S. 652 (2004). *Alvarado*, however, concerned a suspect's history of committing crimes and his resultant

experience with law enforcement.  Here, we have the paradoxical situation in which the suspect himself is a law enforcement officer with thirteen years' experience.  Suffice it to say, defendant *knew* that he was not in custody, *knew* that he was free to speak or not speak, as he wished, and *knew* that he could leave if he so desired.[6]  And, regardless of this finding that defendant is wholly lacking in credibility, no reasonable person in defendant's position would believe he was in custody.

The environment before and during the questioning was extremely cordial and even friendly; so much so, in fact, that defendant encouraged Ms. Leonard to talk freely with Agent Templeton about her own drug trafficking activities and the activities of the individuals who ultimately became her co-defendants.  Ms. Leonard heeded his advice, and she thereupon talked openly about her activities and those of Colunga.  There was no coercive or threatening atmosphere, and it is again noted that defendant was a law enforcement officer, well-schooled in any police matters that implicate the Fourth and Fifth Amendments to the Constitution. His statements, including his answers to Agent Templeton's questions, were freely given, without coercion, and with full knowledge of his right to answer, or not, as he wished.  He was not in custody, or its equivalent, and *Miranda* warnings were not required.

---

[6]From the selfish standpoint of a judge, it is difficult to understand why a law enforcement officer does not give *Miranda* warnings to someone believed to be a suspect prior to questioning, even if the questioning is non-custodial.  The lack of *Miranda* warnings invariably precipitates a motion to suppress, expending judicial time, which is becoming more and more precious.  But, practicalities and selfish interests aside, the law is clear: if the questioning is non-custodial, *Miranda* warnings are not required.

*RECOMMENDATION*

It is recommend that both motions to suppress (Docs. 21 and 24) filed by defendant be denied.[7]

Respectfully submitted,

        s/ Dennis H. Inman
United States Magistrate Judge

---

[7] Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).